IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,

Case No.: 1:17-cr-33-MW/GRJ

v.

MAC JOHNSON,
      Defendant.
_____/

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant, **MAC JOHNSON**, through his undersigned counsel, submits this memorandum outlining the 18 U.S.C §3553(a) factors for the Court's consideration at the March 25, 2019 sentencing hearing:

### Legal Objections:

The Defendant objects to the two (2) level increase of the base offense level predicated on the probation officer's determination that the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means pursuant to USSG § 2B1.1(b)(10)(c). That section provides for a two (2) level increase if the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. The probation supervisor found the Defendant engaged in sophisticated means to commit the offenses because "[T]he defendant would write a check to purchase bank cashier's checks, and these checks

never exceeded $10,000.00, knowing that if they did the IRS would be notified. He then had others convert cashier's checks into cash each week, for a total of 96 checks, totaling $802,646." *Presentence Investigation Report* ¶40.

The Defendant submits that the criminal scheme employed by the defendant was not sophisticated at all. It consisted of the Defendant writing checks for less than $10,000.00 from the Mac Johnson Roofing account at the Drummond Bank that were used to purchase bank cashier's checks. In turn, the cashier's checks were made payable to the Defendant or his wife. He then had his wife and niece obtain cash for the checks, with multiple checks cashed on the same day at different bank branches. *Presentence Investigation Report* ¶24. The Defendant issued the checks in his own name on bank accounts for businesses he owned which were cashed at bank branches equipped with visible security cameras that captured the images of his wife and niece cashing each check.

The guidelines commentary for Subsection (b)(10) explains that "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense..." The examples provided in the commentary are "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." No such sophisticated conduct was employed by the defendant in the *case sub judice*; there were no fictitious entities, corporate shells or offshore financial accounts. To the contrary, the Defendant used his real name, usual business account and same local bank in the execution of the offenses; with all due respect, the sophistication of this "scheme" reminds one more of Barney Fife than Bernie Madoff.

The Defendant objects to the two (2) level increase for the defendant's role in the offense based on the determination that the Defendant was an organizer,

leader, manager, or supervisor because he directed his wife and niece to convert the cashier's checks to cash.

As noted above, the Defendant signed the checks that were converted to cash. While family members cashed the checks at his behest, the Defendant's business was the sole beneficiary who derived any benefit from his unlawful conduct with no other participants being organized, led, managed or supervised by Mr. Johnson.

Accordingly, the Defendant respectfully submits that his total offense level should be 20 in criminal history category I with a guideline range of 33-41 months.

## 18 U.S.C. §3553 Factors for consideration in imposing sentence:

### 1. Nature and circumstances of the offense and history and characteristic of the Defendant

The Defendant began working as a roofer when he was only twelve years old. Even without graduating high school, the defendant had arranged to borrow the money to purchase a single truck to get him started in the roofing business, something he had learned about from his work experience only. Mac Johnson has operated as a roofing contractor in North Florida since 1988, always doing business as Mac Johnson Roofing. He also started three other businesses: Johnson and Son Tree Service, Johnson and Son Land Development, and Johnson and Son Dumpster and Crane. In 2004 and 2005, local storms caused his businesses to boom, but in 2008 the economy collapsed under the weight of the Great Recession. The national and local construction industry suddenly ground to a halt and the Defendant's business nearly collapsed. Mr. Johnson was thrown so deep in debt that others suggested that he file for bankruptcy protection. Out of a sense of the

obligation he felt to both his suppliers and to those employees who had worked with him for years (and were dependent on him for their livelihood), Mr. Johnson chose not to follow that advice. Instead, Mac Johnson elected to keep the doors open and weather the storm, which he did without laying off even one of the twenty to twenty-five long-term employees that had been loyal to him through good times and bad.

While the motivation to keep the business afloat was well intended, the transparent scheme he employed was both flawed and criminal. He underreported income; he failed to pay taxes and underpaid workers compensation premiums. Moreover, the Defendant knowingly employed undocumented workers, albeit the most reliable source of labor when it came to working on roofs in the Florida heat. When Mr. Johnson learned of the investigation, he and his counsel immediately and fully cooperated with the government, accepted responsibility for his conduct without reservation and entered a guilty plea to all four counts of the Information.

The Defendant has constantly been ready, willing and able to provide substantial assistance. During the earlier stages of the investigation, he attempted on a number of occasions to provide information about other individuals in his industry who were violating the law and, in particular, were employing undocumented workers (a practice which even the government will concede was not uncommon in the construction and agricultural sectors). For reasons unknown to the Defendant, the government did not pursue the information he provided. Accordingly, the Defendant was denied the opportunity for a downward departure for substantial assistance through no fault of his own.

Significantly, the Defendant has paid restitution to the victims in this case in the following amounts:

| | |
|---|---|
| Continental Casualty | $160,000.00 |
| Florida WC Joint Underwriters | $207,000.00 |

| | |
|---|---|
| State of Florida | $266,530.45 |
| Southeast Personnel Leasing | $ 25,000.00 |
| Internal Revenue Service | $ 529,496.44 ($400,000.00 paid to date; remaining balance will be paid prior to sentencing) |
| **Total:** | **$1,188,026.44** |

It is important to note that the reason the Government agreed to allow settlement negotiations with each of the workers compensation carriers was because not a single workers compensation claim was actually filed against them during the entire time period alleged in the Information. Thus, the carriers were actually paid reimbursement for unpaid premiums even though they had never suffered any actual loss exposure. The Defendant acknowledges and accepts that he owed the money, but wants the Court to be aware that there were no unpaid workers compensation claims filed by any of the Defendant's employees, nor was there any report of injured workers going untreated. Additionally, the Court should know that the applicable statute of limitations has now expired on all potential workers compensation claims.

2. **Need for the sentence imposed**

The Defendant respectfully submits that the publicity following his arrest has already accomplished the sentencing needs outlined in §3553(a)(2). The charges filed in federal court reflected the seriousness of the offense. The extensive media coverage surrounding his arrest afforded deterrence to others in the construction industry and, no doubt, served to protect the public from further crimes of the defendant. Several of the defendant's clients initially withdrew from their contracts; banks that he had longstanding relationships with, called in his lines of credit. Indeed, the problem of paying back the required restitution was exacerbated by the fact that the day after the media reports of his plea, nearly every

supplier cut off all credit and filed liens on all properties where the Defendant was working. It was a very humbling experience for the Defendant and his competitors in the roofing industry took note. The defendant submits hiring improperly documented employees for roofing in this area substantially decreased following his arrest.

### 3. Kinds of sentencing available

The Court has a wide range of sentencing options available to impose a sentence that is sufficient, but not greater than necessary to comply with the factors set forth in 18 USSC §3553(a). The Defendant respectfully submits that the most suitable option is to place him on home detention as a substitute for imprisonment. The Defendant has been under the supervision of Pretrial Services since he was taken into custody on January 10, 2018, and he has had no problems, nor has he presented any resistance to all of the terms imposed. For well over a year, he has proven that he is amenable to supervision. Placing the Defendant on home detention will keep his business open, keep the seventy families who depend on him for a paycheck working, and allow him to continue to provide support for his family. The Defendant will abide by any special conditions imposed by the court while on home detention.

The Defendant has made a terrible mistake which neither good intentions nor desperate circumstances justify. Mac Johnson, however, has been an employer who has made a practice of paying employees while they were suffering from cancer or other illnesses, even when they could not work. Mr. Johnson comes from a tough background and in his youth battled alcohol abuse and a bad temper – but he has overcome both. He is admired by many for becoming the largest employer in the small town of Newberry, Florida through hard work and perseverance. Mac doesn't sit in an office – he still gets on the roofs he installs

and repairs; in fact, yesterday he was working as a mechanic on a broken down roofing truck. When Mr. Johnson entered his plea, everyone was skeptical when he said he would make right what he owed. He accomplished the terms of this restitution by selling things dear to him and his family and by working fifteen hour days. This Court will learn that Mac Johnson built his business from the ground up. In fact, his daughter will tell this Court that he has worked so much that the family vacations rarely included her dad due to his constantly being at work. Everyone will tell this Court that the businesses cannot survive the loss of their founder for even weeks, much less months.

In the past this Court had few, if any, options available to it when sentencing a criminal defendant. Fortunately, that phase of our criminal justice system is in the past. The reason is simple: Judges are appointed to adjudicate each case and each Defendant on their unique circumstances. This Court from its own experience knows that there is a difference between bad people and bad decisions. To those who argue that consistency and proportionality are the required goals of our criminal justice system, one simply needs to remember Emerson's dictum regarding the foolishness of consistency under all circumstances.

No one is offering excuses to the Court; rather, we are simply reminding it that Mac Johnson, with the help of those who believe in him, has already shown that he will do what he says he will do and will comply with the terms imposed upon him by this Court. This Court has probably never sentenced a criminal defendant who has worked harder to earn the Court's trust and his community's forgiveness. Some will say this is a "white collar" crime, but the truth is Mac Johnson is, and always has been, a "blue-collar" worker who lost his way chasing dreams of success. He broke the law and for that he is accountable – but Mr. Johnson was never stashing away hoards of money or committing acts of predation on disadvantaged workers; nor did he, like some in the recent past, use enormous

wealth and prestige for his own personal or political advantage. His methods were, as he openly admits, wrong, but his intentions were never to harm a single person who worked for him or did business with him. Certainly Mac Johnson deserves punishment, but it should not be one that destroys the lives of so many others. The Defendant will present its further supporting witnesses and arguments at the March 25 sentencing hearing.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to Assistant United States Attorney Greg McMahon by hand delivery to the United States Attorney's Office as instructed; and via email to Danielle Durst, Danielle.Durst@usdoj.gov; United States Probation Officer Andrew Swope at Andrew_Swope@flnp.uscourts.gov and Co-Counsel for Defendant, Terry N. Silverman, Esq. at tsilverman@gainesvillelaw.com on this 14th day of March, 2019.

Respectfully submitted,

/s/ Rod Smith
Rod Smith, Esq.
Florida Bar No.: 0202551
John Whitaker, Esq.
Florida Bar No.: 0196363
2814 SW 13th Street
Gainesville, FL 32608
Attorneys for Defendant
email: rodsmith@avera.com
　　　　raservice@avera.com
　　　　jwhitaker@avera.com
　　　　jwservice@avera.com